**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 45374-6-II |
| Respondent, | |
| v. | |
| ZYION HOUSTON-SCONIERS, | consolidated with |
| Appellant. | |
| STATE OF WASHINGTON, | No. 45414-9-II |
| Respondent, | |
| v. | |
| TRESON LEE ROBERTS, | consolidated with |
| Appellant. | |
| In re the Personal Restraint Petition of: | No. 47085-3-II |
| ZYION HOUSTON-SCONIERS, | |
| Petitioner, | PUBLISHED IN PART OPINION |

MELNICK, J. — Zyion Houston-Sconiers and Treson Roberts were jointly prosecuted for a series of robberies and other crimes committed on Halloween when they were both under the age of 18. They appeal their convictions, arguing that the "automatic decline" statute, RCW 13.04.030,

which mandated that they be tried as adults and not juveniles, is unconstitutional under recent federal Eighth Amendment jurisprudence. In the published portion of this opinion, we hold that RCW 13.04.030 does not violate the Eighth Amendment's prohibition against cruel and unusual punishment.

In the unpublished portion of this opinion, we address Houston-Sconiers's and Roberts's additional arguments, including that (1) the trial court violated their right to confront witnesses against them by admitting an out-of-court statement made by a witness who did not testify at trial; (2) insufficient evidence supported their assault in the second degree convictions and all of their firearm sentence enhancements; (3) prosecutorial misconduct deprived them of a fair trial; and (4) the trial court erred by imposing discretionary legal financial obligations (LFOs) without considering their individual ability to pay.

Additionally, Houston-Sconiers asserts in a personal restraint petition (PRP) that the trial court erred by refusing to grant him an evidentiary hearing on his motion to suppress evidence, by depriving him of his right to be present at every critical stage of the trial, and by denying his proposed missing witness instruction. He also makes additional allegations of prosecutorial misconduct.

We hold that admittance of the challenged out-of-court statement did not violate Houston-Sconiers's and Roberts's right to confront witnesses against them because the statement was nontestimonial; sufficient evidence supports their assault convictions and all of their firearm sentence enhancements; prosecutorial misconduct did not deprive them of a fair trial; and, the trial court did not err by imposing discretionary LFOs because it engaged in the required individualized inquiry about Houston-Sconiers's and Roberts's ability to pay. Accordingly, we affirm the trial court. We also deny Houston-Sconiers's PRP.

FACTS

RCW 13.04.030 — "AUTOMATIC DECLINE" STATUTE

Houston-Sconiers and Roberts were charged with and ultimately convicted of numerous crimes, including multiple robberies in the first degree. At the time they committed the crimes, Houston-Sconiers and Roberts were 17- and 16-years-old respectively; however, they were tried in adult court because of the nature of the offenses with which they were charged. *See* RCW 13.04.030(1)(e)(v)(C).[1] Adult court had exclusive jurisdiction over them.

Houston-Sconiers was convicted of six counts of robbery in the first degree, one count of assault in the second degree, one count of conspiracy to commit robbery in the first degree, and one count of unlawful possession of a firearm. The jury specially found that Houston-Sconiers was armed with a firearm during five of the six robberies, the assault, and the conspiracy. Roberts was convicted of four counts of robbery in the first degree, one count of assault in the second degree, and one count of conspiracy to commit robbery in the first degree. The jury specially found that Roberts was armed with a firearm during those crimes.

The trial court followed the State's recommendation and sentenced Houston-Sconiers to an exceptional sentence of zero months' confinement for each count. It imposed the mandatory 372 months' confinement for the seven firearm sentence enhancements. The trial court also followed the State's recommendation with respect to Roberts. It sentenced him to an exceptional sentence of zero months' confinement for each count. It imposed the mandatory 312 months' confinement for the six firearm sentence enhancements.

---

[1] Under RCW 13.04.030(1)(e)(v)(C), adult court has exclusive jurisdiction over juveniles who are 16- or 17-years-old on the date of the alleged offense when they commit certain alleged offenses, including robbery in the first degree.

ANALYSIS

Houston-Sconiers and Roberts argue that the automatic decline statute in combination with statutorily-mandated sentencing enhancements violate both the due process clause[2] and the Eighth Amendment to the United States Constitution. They specifically argue that juveniles are treated like adults without an individualized inquiry into the nature of the offenses and the maturity of the juveniles.

Houston-Sconiers and Roberts acknowledge that our Supreme Court has previously upheld the automatic decline statute's constitutionality in *In re Boot*, 130 Wn.2d 553, 925 P.2d 964 (1996), but they argue that the reasoning on which the court relied has been rejected. They rely primarily on a series of United States Supreme Court cases that address how the Eighth Amendment's ban on cruel and unusual punishment applies to sentencing juveniles: *Roper v. Simmons*, 543 U.S. 551, 568, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *Graham v. Florida*, 560 U.S. 48, 76, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

In *Roper*, the Court held that the Eighth Amendment prohibits courts from imposing the death penalty for crimes committed while a juvenile. 543 U.S. at 568. Then in *Graham,* the Court held that the Eighth Amendment prohibits a court from imposing a sentence of life without parole

---

[2] Houston-Sconiers and Roberts make no arguments relying on the state constitution; therefore, we will only consider federal constitutional law. *See In re Boot*, 130 Wn.2d 553, 570 n.9, 925 P.2d 964 (1996).

on a juvenile offender for a crime that is not a homicide. 560 U.S. at 82. Two years later, in *Miller*, 132 S. Ct. at 2460, the Court held that mandatory life-without-parole sentences for juvenile offenders also violates the Eighth Amendment. *Miller* requires courts to engage in "individualized consideration" of juvenile offenders facing life in prison without the possibility of parole. 132 S. Ct. at 2469-70. According to the Court, "[b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Miller*, 132 S. Ct. at 2469. The Supreme Court recognized three general differences between juveniles and adults. First, juveniles lack maturity and have an underdeveloped sense of responsibility, which leads to "recklessness, impulsivity, and heedless risk-taking." *Miller*, 132 S. Ct. at 2464. Second, juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. Third, the character of a juvenile is not as well formed as that of an adult; a juvenile's actions are less likely to be evidence of irretrievable depravity. *Miller*, 132 S. Ct. at 2464.

Houston-Sconiers and Roberts contend that these cases undermine *Boot*'s Eighth Amendment analysis. In *Boot*, our Supreme Court held that the automatic decline statute did not violate the Eighth Amendment, or either procedural or substantive due process under the federal constitution. 130 Wn.2d at 568-72. Because the defendants had neither been tried nor sentenced, the court concluded it could not scrutinize the case under the Eighth Amendment's ban on cruel

and unusual punishment. *Boot*, 130 Wn.2d at 569. The court proceeded to state that the only possible Eighth Amendment issue before it related to the claim that adult court jurisdiction in and of itself constitutes punishment. *Boot*, 130 Wn.2d at 569. Our Supreme Court noted that although the parties advanced no support for such an assertion, if they did, they would have to contend with the contrary holding of *State v. Massey*, 60 Wn. App. 131, 803 P.2d 340 (1990). *Boot*, 130 Wn.2d at 569. In *Massey*, we rejected an Eighth Amendment challenge to a life imprisonment without parole sentence for a 13 year old. 60 Wn. App. at 145-46. We reasoned that the test for whether a sentence is cruel and unusual under the Eighth Amendment balances the crime committed and the sentence imposed but does not consider the defendant's age. *Massey*, 60 Wn. App. at 145.

Eighth Amendment jurisprudence has evolved since *Boot* and *Massey*. It is now clear that age may be considered in an Eighth Amendment challenge. *Graham*, 560 U.S. at 76. Although we recognize the referenced portion of *Massey* is no longer good law, the remainder of the court's analysis in *Boot* is still valid. In other words, a successful Eighth Amendment challenge to the automatic decline statute still requires a defendant to show that this method of asserting adult court jurisdiction, in and of itself, is punishment; however, Houston-Sconiers and Roberts do not make this showing.

*Boot* also held that application of the automatic decline statute does not violate the substantive due process rights of defendants. 130 Wn.2d at 571-72. Houston-Sconiers and Roberts argue that *Roper*, *Graham*, and *Miller* undercut *Boot*'s holding that the automatic decline statute does not violate substantive due process. Neither *Roper*, *Graham*, nor *Miller* considered due

process arguments; therefore, they do not undermine *Boot*'s holding on substantive due process.[3]

Houston-Sconiers and Roberts's entire argument is that *Boot* is undermined. Even if *Boot*'s rationale is undermined to a degree that *Boot* no longer controls, Houston-Sconiers and Roberts would still need to demonstrate that their sentences violated the Eighth Amendment, either because the sentences were grossly disproportionate to all the circumstances of the particular cases, *i.e.*, the gravity of the offenses is grossly disproportionate to the sentence, or because the sentences fit within a categorical restriction which is based on the nature of the offense or the characteristics of the offender. *See Graham*, 560 U.S. at 59-60; *see also Miller*, 132 S. Ct. at 2463. Houston-Sconiers and Roberts never explain how their sentences violate due process or the Eighth Amendment's prohibition against "cruel and unusual" punishment. U.S. CONST. amend. VIII.

---

[3] However, we note that *Boot*'s substantive due process analysis does appear to be based on the outdated understanding that juveniles' lessened culpability was relevant only in capital cases. The defendant in *Boot* relied on *Thompson v. Oklahoma*, 487 U.S. 815, 838, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988), in which the United States Supreme Court held that the Eighth Amendment prohibited the execution of a person who was under 16 years old at the time of his or her offense. *Boot*, 130 Wn.2d at 571. The *Thompson* Court also endorsed the proposition that juveniles are less culpable than adults who commit comparable crimes. 487 U.S. at 835. Our Supreme Court concluded that the *Thompson* reasoning applied only to capital cases and refused to apply it to crimes not calling for the death penalty because the death penalty was thought to be qualitatively different from a sentence of imprisonment, even life imprisonment without parole. *Boot*, 130 Wn.2d at 572. Since *Boot*, the United States Supreme Court has incrementally expanded the *Thompson* rationale to categorically ban the death penalty for crimes committed as a juvenile, life without parole for a non-homicide crime committed as a juvenile, and mandatory life without parole sentences for any juvenile offenders. *Miller*, 132 S. Ct. at 2460; *Graham,* 560 U.S. at 76; *Roper*, 543 U.S. 568-75.

Although the United States Supreme Court has expanded categorical restrictions on certain punishments for juveniles due to evolving standards of decency, the expansions are narrow and focus on the most severe punishments: the death penalty and life without the possibility of parole. Life-without-parole sentences "'share some characteristics with death sentences that are shared by no other sentences.'" *Miller*, 132 S. Ct. at 2459 (quoting *Graham*, 560 U.S. at 69). Therefore, *Boot*'s substantive due process analysis is still valid, *i.e.*, the special treatment of juveniles is limited to the express categorical rules espoused by the United State Supreme Court.

We reject Houston-Sconiers and Roberts's assertion that *Roper*, *Graham*, and *Miller* stand for the proposition that any sentencing statute that automatically treats a juvenile the same as an adult is unconstitutional. *Roper*, *Graham*, and *Miller* do not prohibit adult court from exercising exclusive jurisdiction over older juveniles who commit robbery in the first degree. Nor do they prohibit juveniles from being subject to generally applicable criminal sentencing laws unless they implicate the death penalty, life without the possibility of parole for non-homicide crimes, or mandatory life without the possibility of parole for any juvenile offenders.

In so holding, we are aware that the legislature's enactment of the automatic decline statute predated much of the research and data relied on by the Supreme Court in *Roper*, *Graham*, and *Miller*. "These studies reveal fundamental differences between adolescent and mature brains in the areas of risk and consequence assessment, impulse control, tendency toward antisocial behaviors, and susceptibility to peer pressure." *State v. O'Dell*, No. 90337-9, 2015 WL 4760476, at \*6 (Wash. Aug. 13, 2015). We are also aware that many of these factors are not present in this case. Although it may be time for the legislature to take another look at the automatic decline statute, we recognize it is the role of the legislative branch of government to make these types of policy decisions. We join the Illinois Supreme Court in urging our legislature to review our automatic decline statute utilizing current scientific and sociological evidence, which indicates a need for the exercise of judicial discretion in determining the appropriate setting for juvenile cases. That court stated:

> We do, however, share the concern expressed in both the Supreme Court's recent case law and the dissent in this case over the absence of any judicial discretion in Illinois's automatic transfer provision. While modern research has recognized the effect that the unique qualities and characteristics of youth may have on juveniles' judgment and actions, the automatic transfer provision does not. Indeed, the mandatory nature of that statute denies this reality. Accordingly, we strongly urge the General Assembly to review the automatic transfer provision based on the current scientific and sociological evidence indicating a need for the

exercise of judicial discretion in determining the appropriate setting for the proceedings in these juvenile cases.

*People v. Patterson*, 2014 IL 115102, 25 N.E.3d 526, 553, 388 Ill Dec. 834, *reh'g denied* (Jan. 26, 2015) (internal citations omitted).

Unlike the defendants in *Roper*, *Graham,* and *Miller*, Houston-Sconiers and Roberts were not sentenced to death or life without the possibility of parole. On the contrary, the trial court exercised its discretion and imposed exceptional sentences well below the standard ranges. It sentenced Houston-Sconiers and Roberts to zero months' confinement for the crimes themselves and imposed confinement for only the mandatory firearm sentence enhancements.

Houston-Sconiers received a sentence of 372 months' confinement for the mandatory firearm sentence enhancements on six counts of robbery in the first degree, one count of conspiracy to commit robbery in the first degree, one count of assault in the second degree, and one count of unlawful possession of a firearm. Roberts received a sentence of 312 months' confinement for the mandatory firearm sentence enhancements on four counts of robbery in the first degree, one count of conspiracy to commit robbery in the first degree, and one count of assault in the second degree.

The trial court sentenced both Houston-Sconiers and Roberts to confinement well short of the most severe punishments at issue in *Roper* (death penalty), *Graham* (life without parole), and *Miller* (life without parole). Houston-Sconiers and Roberts fail to show that their sentences, which were exceptional sentences below the standard range, constitute cruel and unusual punishment or otherwise violate the Eighth Amendment or due process.

In light of the presumption of constitutionality accorded to our legislature's enactments, *State v. Jorgenson*, 179 Wn.2d 145, 150, 312 P.3d 960 (2013), we hold that application of RCW 13.04.030(1)(e)(v) along with mandatory sentence enhancements does not violate the Eighth Amendment under the dictates of *Roper*, *Graham*, and *Miller*. We affirm.

9

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

FACTS

Brothers Andrew and Steven Donnelly went trick-or-treating in Tacoma on October 31, 2012. Andrew, 19 years old, wore a graduation robe and a red devil mask. He collected candy in an orange cloth bag with a picture of a pumpkin on it. His 13-year-old brother, Steven, dressed as a ninja, collected candy in a black, blue, and gray backpack.

At approximately 9:00 P.M., in the area of South Sheridan, three young black men wearing dark clothing approached the Donnelly brothers. One of the young men wore a "white hockey mask," the second wore a black cloth mask, and the third wore a blue bandanna that obscured his mouth and lower face. 12 Report of Proceedings (RP) at 1004. The one with the hockey mask said "this is a stick-up" and pointed a silver gun with white grips at Steven's face. 12 RP at 992. The young men told Andrew and Steven to hand over their bags. The young men took the bags and Andrew's red devil mask, and then ran away.

The Donnelly brothers returned to their grandparents' house and called the police. The 911 call occurred at 9:28 P.M. A responding police officer interviewed Andrew and Steven. She then broadcasted the suspects' descriptions because she thought the robbery might be related to other recent reports of robberies.

A group of five friends—Destinae Peterson-Mims, Ishaiah Greene, Edward Bradley, Axsaulis Guice, and Ronald Jones—also went trick-or-treating in Tacoma that evening. At approximately 9:00 P.M., near the area of Stadium High School and Wright Park, three masked

10

young black men wearing dark clothing approached the group.[4] One of the young men, who wore a white mask and dark clothing, pointed a silver revolver at the group. The young man with the gun told the group that it was a "stickup" or robbery and demanded everything, including their bags of candy and cellular phones. 11 RP at 820. Guice recognized this man's voice as a person she knew by the name "Tiny," who was later identified as Houston-Sconiers. 11 RP at 824. Another young man wore a red mask and two of the young men in the group had blue bandannas tied on their pants.

Guice hid her backpack with her body, backed away, and walked to a neighboring house to get help. Peterson-Mims handed over the black silky pillow case she had been using to collect candy and she then followed Guice. Jones ran off and hid in some bushes while Bradley and Greene relinquished their backpacks. The assailants ran away, and then Bradley, Greene, and Jones joined Peterson-Mims and Guice at the nearby house. Peterson-Mims's parents picked up some of the group. Peterson-Mims's father called 911 to report the robbery at 9:32 P.M. An officer responded and interviewed Peterson-Mims and Guice.

Less than an hour later, at 10:22 P.M., James Wright called 911 to report that he had been robbed. Officer Rodney Halfhill responded within a few minutes of the call from dispatch. When Officer Halfhill approached Wright's location, Wright was jumping up and down and waving his arms, pointing and saying, "[T]hey're over there. They ran over there." 12 RP at 1069. Officer Halfhill described Wright as a 37-year-old black man. Officer Halfhill immediately called for police units to set up containment and asked for a K-9 unit to respond. Officer Halfhill then interviewed Wright at the scene.

---

[4] Greene testified that he and his friends were approached by a group of five men: three men came forward and two stayed back.

Wright told Officer Halfhill that while talking on his cellular phone and walking down the street in front of an apartment building, he saw four or five black men go through the apartment buildings and into the courtyard. He heard them approach him from behind and he turned around. One of the men, who wore a black hooded sweatshirt with a gray emblem on the front and a "Halloween Jason-style hockey mask," pulled out a silver revolver and demanded Wright's cellular phone. 12 RP at 1074. Wright complied.

The K-9 tracking team responded and led officers down an alley to a Cadillac parked in Dorothy Worthey's backyard. Its windows were fogged over, so officers used flashlights to look inside the Cadillac. They saw several people. The officers ordered everyone out of the Cadillac. Five young black men exited the Cadillac and were taken into custody: Houston-Sconiers, Roberts, Zion Johnson, LeShawn Alexander, and Amancio Tolbert.

Houston-Sconiers wore a dark gray vest over a dark blue long-sleeved thermal shirt, black pants, and a hat that looked like the hood of a sweatshirt. Roberts wore a black windbreaker jacket, a white t-shirt, gray pants, and had a blue bandanna in his possession. Thirteen-year-old Johnson wore a black nylon hooded jacket, black jeans, and a do-rag. He had a blue bandanna and two cellular phones in his actual possession. Alexander wore gray jeans and a gray sweatshirt with some sort of graphic on it. Tolbert wore a blue hoodie-type sweater, a Florida Gators shirt, and dark pants.

The homeowner, Worthey, approached the officers and consented to a search of the Cadillac parked in her yard.[5] Worthey told an officer that the car belonged to her son, but that it

---

[5] Worthey knew Roberts and recognized some of the other young men, including Houston-Sconiers, as friends of her grandson. Although she did not give them permission to be in the Cadillac, her grandson and his friends had used the Cadillac as a hangout spot in the past.

had not been moved for some time because it was in disrepair. Inside the Cadillac, officers found a black cloth hood, three backpacks, a red plastic devil mask, a white plastic mask, and a silver revolver under the front passenger seat.

All five of the young men were initially charged with multiple counts of robbery.[6] The State charged both Houston-Sconiers and Roberts with seven counts of robbery in the first degree, one count of assault in the second degree, one count of conspiracy to commit first degree robbery, and one count of unlawful possession of a firearm. The State also alleged that Houston-Sconiers and Roberts were armed with a firearm during the commission of the robberies, the assault, and the conspiracy.

Houston-Sconiers and Roberts moved to suppress the evidence found in the Cadillac, but the trial court denied the motion. More information about that motion will be provided in the analysis section.

When Houston-Sconiers and Roberts learned that Wright would not testify at trial, Houston-Sconiers's counsel moved to exclude the statement Wright made to Officer Halfhill. The motion was based on a claimed violation of the right to confront witnesses.[7] The trial court denied the motion and ruled that Wright's statement to Officer Halfhill that described being robbed was nontestimonial. The trial court ruled that admitting Wright's statement, even though he would not be present to testify, did not violate Houston-Sconiers's and Roberts's right to confront witnesses

---

[6] Johnson pled guilty to two counts of robbery in the first degree. Afterward, the court granted Johnson immunity so that he would be available to testify at Houston-Sconiers and Roberts's trial. All of the charges against Tolbert and Alexander were dismissed, and the trial court also granted them immunity so that they would be available to testify at trial.

[7] Houston-Sconiers and Roberts argue that admitting the statements violated their Sixth Amendment right to confront a witness. U.S. CONST. amend. VI; *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

against them. At trial, Officer Halfhill related to the jury Wright's statement describing the robbery, including descriptions of the suspects.

The State also called Alexander to testify at trial about the events of October 31, 2012. Alexander testified that he met up with Tolbert in the late afternoon and then eventually went to Roberts's house where he and Tolbert met up with Roberts, Houston-Sconiers, and some other people. The group smoked marijuana, drank vodka, and played basketball for two or three hours. Alexander, Tolbert, Johnson, Houston-Sconiers, and Roberts then walked to a nearby elementary school. Houston-Sconiers wore a "Jason mask"; *i.e.*, a white hockey mask. 16 RP at 1447.

Alexander and Tolbert split off from the group. They went to several stores and restaurants before meeting back up with Houston-Sconiers, Roberts, and Johnson later that evening. When Alexander and Tolbert met up with the group again, Roberts had a devil mask and Johnson had a backpack with candy inside that they did not have at the elementary school. Houston-Sconiers, Roberts, and Johnson told Alexander that they had been in the north end of Tacoma.

Alexander testified that the group of five walked towards Roberts's house. On the way, they saw a middle-aged black man talking on his cell phone near some apartments. Roberts and Houston-Sconiers said something like, "[W]e're about to get him," and ran up to the man. 16 RP at 1453. Houston-Sconiers demanded the man's cellular phone, which he handed over. During the encounter, Houston-Sconiers had a silver revolver, and both he and Roberts wore masks.

According to Alexander, Houston-Sconiers and Roberts ran away from the scene, and he, Johnson, and Tolbert followed in the same general direction. As Alexander walked away, he watched the same man they saw with Houston-Sconiers and Roberts make a call on a different cellular phone. Alexander alerted the others that he thought the man was calling the police. All

14

five young men retreated to the Cadillac parked in Worthey's backyard. Within 5 or 10 minutes, the police arrived and ordered the group out of the Cadillac.

Andrew and Steven Donnelly testified at trial and identified one of the backpacks and the red devil mask found in the car as items taken from them. Peterson-Mims, Greene, Bradley, and Guice also testified at trial. Guice identified the red devil mask found in the car as the one worn by one of the men who accosted her and her friends. The State also called Johnson and Tolbert to testify, but they were mostly uncooperative.[8]

Detective Brian Vold testified that he tested the revolver found in the Cadillac and it fired properly. His testimony will be explained in more detail in the analysis section.

Over Houston-Sconiers's objection, the trial court admitted a cellular phone video that depicted Houston-Sconiers in possession of a firearm similar to the one used in the charged robberies and found in the Cadillac. The video was taken a few weeks before Halloween, and it appears that it was shot in a car resembling the Cadillac. The trial court instructed the jury that the video may not be used as evidence of prior misconduct. The State also admitted excerpts of recorded jail phone calls between Houston-Sconiers and unidentified persons. In one of the excerpts, Houston-Sconiers complains about people snitching on him, including Tolbert.

At the close of the State's case-in-chief, the State conceded that it presented insufficient evidence of robbery in the first degree as charged in count VIII and stipulated to its dismissal for

---

[8] Johnson testified that he did not commit any robberies and then answered "I don't know" to most of the questions asked of him. *See* RP at 1088-1092. Tolbert testified that he was at Roberts's house early in the evening, but he did not remember what occurred between then and when he was arrested in the Cadillac later that night. But he also testified that he did not rob anyone or see anyone with a gun. Later, he corrected himself and testified that he did not remember if he robbed anyone. When asked about a previous statement that was inconsistent with his testimony, he said that the earlier statement he gave to detectives was a lie. He explained that he had read Alexander's proffer, memorized it, and repeated it back to gain a "get-out-of-jail-free card." 18 RP at 1823.

both Houston-Sconiers and Roberts. Houston-Sconiers and Roberts moved to dismiss the rest of the charges against them for lack of proof. The trial court denied the motions.

Roberts called his twin brother, Tredell Roberts, and his girlfriend, Shantell Bush, to testify. Roberts's brother and Shantell testified that Roberts was home from early afternoon until 9:00 or 9:30 P.M. Houston-Sconiers rested without putting on a case.

Houston-Sconiers and Roberts proposed a missing witness instruction related to Wright, but the trial court declined to give the instruction.

Houston-Sconiers and Roberts objected and alleged prosecutorial misconduct throughout the State's closing and rebuttal arguments. The details of those objections will be provided in the analysis section.

The jury found Roberts not guilty of two counts of robbery in the first degree (counts I & II)[9] and unlawful possession of a firearm (count XI), and guilty of four counts of robbery in the first degree (counts III, IV, V, IX), assault in the second degree (count VI), and conspiracy to commit robbery in the first degree (count X). The jury answered affirmatively that Roberts was armed with a firearm during the four robberies, the assault, and the conspiracy. The jury found Houston-Sconiers guilty as charged and answered affirmatively that he was armed with a firearm during five of the six robberies, the assault, and the conspiracy.[10]

The trial court adopted the State's recommendation and sentenced Houston-Sconiers to an exceptional sentence below the standard range of zero months' confinement for each count, and it imposed the mandatory 372 months' confinement for the seven firearm sentence enhancements.

---

[9] The jury found Roberts not guilty of robbing the Donnelly brothers.

[10] The jury was not given or did not fill out a special verdict form as to the robbery charged in count IX for Houston-Sconiers.

The trial court also imposed mandatory and discretionary LFO's. It adopted the State's recommendation with respect to Roberts and sentenced him to an exceptional sentence below the standard range of zero months' confinement for each count, and it imposed the mandatory 312 months' confinement for the six firearm sentence enhancements. It also imposed mandatory and discretionary LFOs.

Houston-Sconiers and Roberts appeal their convictions and sentences.

ANALYSIS

I.    RIGHT TO CONFRONT WITNESSES

Houston-Sconiers and Roberts[11] argue that the trial court violated their right to confront witnesses against them by admitting Wright's out-of-court statement. Roberts also argues that his trial counsel's failure to raise the confrontation issue constitutes ineffective assistance of counsel. The State argues that the trial court properly admitted Wright's statement because it was nontestimonial and otherwise admissible under the excited utterance exception to the hearsay rule.[12] We agree with the State.

We review constitutional issues, such as potential violations of the Sixth Amendment right to confront witnesses, de novo. *State v. Dobbs*, 180 Wn.2d 1, 10, 320 P.3d 705 (2014). The Sixth

---

[11] Roberts did not object to Wright's statement, and therefore, he may not raise the issue for the first time on appeal. Roberts does not allege that the issue is a manifest error affecting a constitutional right, which would allow him to raise the issue for the first time on appeal. *See* RAP 2.5(a)(3); *State v. Kronich*, 160 Wn.2d 893, 899, 161 P.3d 982 (2007), *overruled on other grounds by State v. Jasper*, 174 Wn.2d 96, 271 P.3d 876 (2012).

[12] A confrontation clause analysis is separate from analysis under the rules of evidence. *Crawford*, 541 U.S. at 51. Houston-Sconiers and Roberts do not assign error to the trial court's ruling that Wright's out-of-court statements fit within the excited utterance hearsay exception.

Amendment guarantees criminal defendants the right to confront the witnesses against them.[13] U.S. CONST. amend. VI.

A defendant claiming ineffective assistance of counsel has the burden to establish both that counsel's representation was deficient and that the representation prejudiced the defendant's case. *Strickland v. Washington*, 466 U.S. 668, 700, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011). Failure to establish either prong is fatal to an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 700. A lawyer's representation is deficient if after considering all of the circumstances, it falls "below an objective standard of reasonableness." *Grier*, 171 Wn.2d at 33 (quoting *Strickland*, 466 U.S. at 688). Deficient representation prejudices a defendant if there is a "reasonable probability that, but for counsel's deficient [representation], the outcome of the proceedings would have been different." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). Because Roberts bases his ineffective assistance of counsel claim on his lawyer's failure to object to Wright's testimony on confrontation clause grounds, he must show that the objection would have likely succeeded. *State v. Gerdts*, 136 Wn. App. 720, 727, 150 P.3d 627 (2007).

The confrontation clause "'bars admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *State v. Ohlson*, 162 Wn.2d 1, 10, 168 P.3d 1273 (2007) (quoting *Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006)) (internal quotation marks omitted). In *Davis*, 547 U.S. at 822, the United States Supreme Court

---

[13] The Washington Constitution similarly provides a criminal defendant the right "to meet the witnesses against him face to face." WASH. CONST. art I, § 22. The parties do not argue that the state constitution provides stronger confrontation rights than the federal constitution. Accordingly, we analyze Houston-Sconiers's and Roberts's claims solely under the federal confrontation clause.

explained that within the context of police interrogations, whether statements are "testimonial" is determined by the primary purpose of the interrogation.

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, 547 U.S. at 822.

In evaluating the primary purpose of the interrogation, courts objectively evaluate the circumstances of the encounter and the statements and actions of the parties to the encounter. *Michigan v. Bryant*, 562 U.S. 344, 359, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011). "[W]hether an emergency exists and is ongoing is a highly context-dependent inquiry." *Bryant*, 562 U.S. at 364, 364. But an interaction with the police can evolve from "'an interrogation to determine the need for emergency assistance'" into testimonial statements "if a perpetrator is disarmed, surrenders, is apprehended, or . . . flees with little prospect of posing a threat to the public." *Bryant*, 562 U.S. at 365 (citing *Davis*, 547 U.S. at 8228-29).

Our Supreme Court identified four factors to consider when determining whether an out-of-court statement is testimonial: "(1) the timing relative to the events discussed, (2) the threat of harm posed by the situation, (3) the need for information to resolve a present emergency, and (4) the formality of the interrogation." *Ohlson*, 162 Wn.2d at 12; *accord State v. Koslowski*, 166 Wn.2d 409, 418-19, 209 P.3d 479 (2009); *State v. Reed*, 168 Wn. App. 553, 563-64, 278 P.3d 203 (2012). We now turn to the merits of Houston-Sconiers's and Roberts's argument.

Wright did not testify at trial and Houston-Sconiers and Roberts had no prior opportunity to cross-examine him regarding his statement to Officer Halfhill. Therefore, whether the

confrontation clause bars admission of Wright's statement turns exclusively on whether Wright's statement was testimonial.

Houston-Sconiers asserts that the statement Wright made to Officer Halfhill was testimonial because the robbery was over and Wright was in no immediate danger. Houston-Sconiers argues that at that point, Officer Halfhill's interaction with Wright was for the purpose of learning about the crime that had occurred and obtaining information to apprehend the suspects rather than to resolve an ongoing emergency. We disagree.

Here, the four relevant factors weigh in favor of Wright's statement being nontestimonial. First, Wright's statement related to a robbery that had occurred only minutes earlier and the suspects were likely still in the process of fleeing the scene. Officer Halfhill responded to Wright's location within one minute of receiving the call to respond to a robbery. When Officer Halfhill approached Wright's location, Wright was jumping up and down and waving his arms, pointing and saying, "[T]hey're over there. They ran over there." 12 RP at 1069. Officer Halfhill immediately called for police units to set up containment and requested a K-9 unit to respond. Within two minutes, Officer Halfhill reengaged with Wright and asked him to describe the incident. Although Wright's statement described the incident as a past event, Officer Halfhill reasonably believed the suspects were still nearby and still in the process of fleeing the scene.

Second, the armed robbery suspects posed a great threat of harm to the public at large and the investigating officers. At the time Wright made the statement, the armed robbery suspects had fled on foot and posed an ongoing threat to the public. The suspects engaged in a crime spree involving a number of armed robberies on Halloween night when there are an exceptional number of vulnerable juvenile victims wandering through residential neighborhoods.

Third, Wright's statement provided vital information needed to resolve a present emergency. Because of Officer Halfhill's quick response time and Wright's frantic pointing, Officer Halfhill reasonably assumed that the suspects were still nearby. Wright's statement included the number of suspects, the clothing and masks they wore, the direction in which they fled, and the fact that they were armed. Law enforcement needed this information to help investigate and end a dangerous crime spree. The responding officers needed the information to track the at-large armed suspects, to know with whom they were dealing, and to minimize threats to the public and to themselves. *See Ohlson*, 162 Wn.2d at 14.

Fourth, Wright's statement was made at the scene of the crime on or near a public street. This informal setting for an interrogation indicates the presence of an ongoing emergency. Disorganized questioning in an exposed, public area that is neither tranquil nor safe tends to indicate an emergent situation. *Reed*, 168 Wn. App. at 564.

Houston-Sconiers argues that our Supreme Court's decision in *Koslowski*, 166 Wn.2d 409, compels us to decide in his favor. In *Koslowski*, the police responded to a 911 call from a victim of an armed home invasion. 166 Wn.2d at 414. The officer arrived at the victim's home within two minutes of the call to respond and obtained the victim's statement. *Koslowski*, 166 Wn.2d at 414. The State introduced the victim's statement about the incident at trial in lieu of live testimony because she died before trial. *Koslowski*, 166 Wn.2d at 412-13. The court held that the victim's statement was testimonial for purposes of the confrontation clause. *Koslowski*, 166 Wn.2d at 430.

But the facts of *Koslowski* are readily distinguishable. No ongoing emergency existed in *Koslowski*. 166 Wn.2d at 422. The suspects fled before police arrived, and no evidence indicated they remained in the area or might return to the scene. *Koslowski*, 166 Wn.2d at 422, 426, 432. There were also no facts suggesting that the home invasion was part of an active crime spree.

*Koslowski*, 166 Wn.2d at 432. On the other hand, here, the officer responding to Wright's 911 call was seeking information to resolve an ongoing emergency. The police had received reports of numerous similar crimes within the same area, during a short period of time. The suspects had fled moments before on foot. Officer Halfhill's investigation included gathering information from Wright to aid officers in setting up containment and to assist the K-9 unit in tracking the suspects. Although the timing of the statement in this case was roughly equivalent to *Koslowski*, here, where the suspects fled on foot and would have been in close proximity to the crime scene, the response time is more significant. The reports of multiple robberies and armed suspects fleeing on foot created an ongoing emergency and a threat to public safety that was not present in *Koslowski*. Finally, Wright's statement, given in a public place, was less formal than the *Koslowski* victim's statement taken in the privacy of her home.

The application of the four relevant factors to Wright's statement leads us to conclude that the primary purpose of Wright's statement, including identifying information about the suspects, was to meet an ongoing public emergency regarding a violent crime spree on the streets of a residential neighborhood on Halloween night. The trial court did not err by concluding that Wright's statement was nontestimonial. The trial court did not violate Houston-Sconiers's confrontation clause rights by admitting Wright's statement despite Wright's absence at trial. Further, Roberts has failed to demonstrate that his counsel's failure to raise the confrontation clause issue prejudiced him.

II.     SUFFICIENCY OF THE EVIDENCE

Houston-Sconiers and Roberts argue that insufficient evidence exists to support their convictions for assault in the second degree and for the firearm sentencing enhancements. We disagree.

A.     Standard of Review

"The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Salinas*, 119 Wn.2d at 201. Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). Because credibility determinations are for the trier of fact and are not subject to review, *State v. Camarillo,* 115 Wn.2d 60, 71, 794 P.2d 850 (1990), we defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Andy*, 182 Wn.2d 294, 303, 340 P.3d 840 (2014).

B.     Assault in the Second Degree

Houston-Sconiers and Roberts argue that the State failed to prove that they assaulted Guice. Specifically, they claim that the State did not prove that Guice felt a reasonable apprehension of imminent bodily injury. We disagree.

The State charged Houston-Sconiers and Roberts with assault in the second degree.[14] Consistent with the statute, the trial court instructed the jury that: "A person commits the crime of

---

[14] RCW 9A.36.021(1)(c)

assault in the second degree when he or she assaults another with a firearm." Clerk's Papers (CP) (Houston-Sconiers (HS)) at 182. Additionally, the jury was instructed that,

> An assault is an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.[15]

CP (HS) at 183.

Viewing the evidence in the light most favorable to the State, sufficient evidence exists for a jury to conclude that Guice felt a reasonable apprehension of imminent bodily injury. "Apprehension and fear experienced by a person at whom a gun is pointed may be inferred, unless he knows it to be unloaded." *State v. Stewart*, 73 Wn.2d 701, 705, 440 P.2d 815 (1968). Guice testified that at approximately 9:00 P.M. on Halloween night, three men approached her and her friends. One of the men said "this is a stickup," pointed a gun at Guice and her friends, and demanded that they hand over their bags and cellular phones. 11 RP at 820. One of the men wore a red mask. Guice hid her backpack, backed away, and immediately went to a nearby house "[t]o get some help." 11 RP at 826. Guice testified that the incident was "unbelievable." 11 RP at 826. The evidence supports the jury's verdict that Guice was in apprehension and fear of bodily injury during the incident, and Houston-Sconiers's and Roberts's claims that insufficient evidence exists for their assault convictions fail.

---

[15] The term "assault" is not defined in the criminal code, so Washington courts turn to the common law definition. *State v. Aumick*, 73 Wn. App. 379, 382, 869 P.2d 421 (1994), *aff'd*, 126 Wn.2d 422 (1995).

C. Firearm Enhancements

1. Firearm Enhancement for Conspiracy

Houston-Sconiers and Roberts argue that insufficient evidence supports the jury's verdicts that they were armed with a firearm at the time they conspired to commit robbery (count X) because there were no facts from which a reasonable jury could infer a connection between the firearm and the crime of conspiracy. We disagree.

Houston-Sconiers and Roberts were each charged with conspiracy to commit first degree robbery while armed with a firearm. Washington's conspiracy statute states:

> A person is guilty of criminal conspiracy when, with intent that conduct constituting a crime be performed, he or she agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them takes a substantial step in pursuance of such agreement.

RCW 9A.28.040(1). To apply the firearm enhancement, the State had the burden of proving that the defendant or an accomplice was armed with a firearm at the time of commission of the conspiracy to commit robbery in the first degree. *State v. Barnes*, 153 Wn.2d 378, 387, 103 P.3d 1219 (2005).

A defendant is armed "'if a weapon is easily accessible and readily available for use, either for offensive or defensive purposes.'" *State v. Eckenrode*, 159 Wn.2d 488, 493, 150 P.3d 1116 (2007) (quoting *State v. Valdobinos*, 122 Wn.2d 270, 282, 858 P.2d 199 (1993)). There must also be a nexus between the defendant, the crime, and the weapon. *Eckenrode*, 159 Wn.2d at 493.

Houston-Sconiers and Roberts do not dispute that sufficient evidence existed to convict them of conspiracy. Rather, they challenge only whether sufficient evidence supported a nexus between the firearm and the crime of conspiracy. They argue that even if a firearm was "available for use" for the eventual agreed upon crime, it cannot logically be "available for use" in furtherance of the actual agreement. Br. of Appellant (HS) at 24.

25

Here, Houston-Sconiers and Roberts worked in concert to commit multiple similar robberies, on Halloween night, using a firearm. Andrew and Steven Donnelly testified that Houston-Sconiers and Roberts approached them on the street, announced that a robbery was occurring, pointed the gun at one or more of the victims, and demanded their belongings. Similarly, Houston-Sconiers and Roberts also approached Peterson-Mims, Greene, Bradley, Guice, and Jones, announced that it was a robbery, pointed a gun at the group, and demanded their possessions. Finally, Houston-Sconiers and Roberts robbed Wright by approaching him on the street, brandishing a gun, and demanding his cellular phone.

We conclude that sufficient evidence exists for a reasonable jury to infer that the firearm was connected to the conspiracy because the agreement to commit the robberies involved the use of a firearm. The State presented sufficient evidence of the nexus between the firearm and the conspiracy to support the jury's verdict that Houston-Sconiers and Roberts were "armed" with a firearm during the commission of the conspiracy charged in count X.

2.      All Firearm Enhancements

Houston-Sconiers and Roberts also argue that insufficient evidence exists to support their firearm sentence enhancements because the State did not prove that the firearm was capable of firing a projectile at the time of the crime, as is required by statute. The State argues that such proof is not required. We agree with the State.

The trial court instructed the jury that "[a] 'firearm' is a weapon or device from which a projectile may be fired by an explosive such as gunpowder." CP (HS) at 195; *accord* RCW 9.41.010(9). We have repeatedly held that this definition does not limit firearms to only those guns capable of being fired at the time of the crime. *State v. Wade*, 133 Wn. App. 855, 873, 138

26

P.3d 168 (2006); *State v. Berrier*, 110 Wn. App. 639, 645, 41 P.3d 1198 (2002); *State v. Faust*, 93 Wn. App. 373, 380-81, 967 P.2d 1284 (1998).

Houston-Sconiers and Roberts argue that this line of cases were wrongly decided because when we found former RCW 9.41.010(1) ambiguous, we did not adopt the interpretation most favorable to the criminal defendant as provided by the rule of lenity. *State v. Padilla*, 95 Wn. App. 531, 534, 978 P.2d 1113 (1999). However, we apply the rule of lenity when the legislature's intent is insufficiently clear to resolve the ambiguity, *State v. Evans*, 177 Wn.2d 186, 193, 298 P.3d 724 (2013), which is not the case with regard to RCW 9.41.010(1), and we decline to revisit this issue.

The gun at issue was a .32 caliber revolver. Detective Vold testified that he tested its operability and "[i]t fired as it[']s designed to do without any problems." 13 RP at 1280. However, he did not test the firearm with the type of ammunition loaded in the gun at the time it was seized because, although it was the same caliber, that ammunition was not "an exact match for what this weapon is designed to shoot." 13 RP at 1281. He further testified that he did not know if the gun would have fired as it was loaded at the time the crimes were committed.

We conclude that Detective Vold's testimony that the gun was operable with the correct ammunition provides sufficient evidence for the jury's verdict. *See Wade*, 133 Wn. App. at 873; *Faust*, 93 Wn. App. at 380-81. Accordingly, Houston-Sconiers's and Roberts's claims fail.

III.     PROSECUTORIAL MISCONDUCT

Houston-Sconiers and Roberts allege that numerous instances of prosecutorial misconduct denied them a fair trial. Although the prosecutor did err in a few instances, Houston-Sconiers and Roberts received a fair trial.

A.      Standards of Review

A defendant who alleges prosecutorial misconduct first must establish that the prosecutor's conduct was improper. *State v. Emery*, 174 Wn.2d 741, 759, 278 P.3d 653 (2012). Once a defendant establishes that a prosecutor's statements were improper, we must determine whether the defendant was prejudiced. *Emery*, 174 Wn.2d at 760. If the defendant objected at trial, he must show that there is a substantial likelihood the misconduct affected the jury's verdict. *State v. Anderson*, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009).

If the defendant did not object at trial, he is deemed to have waived any error unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. *Emery*, 174 Wn.2d at 760-61. When reviewing a claim that prosecutorial misconduct requires reversal, we review the statements in the context of the entire case. *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011).

B.      Reference to Uncharged Crimes in Closing Argument

Houston-Sconiers and Roberts argue that the prosecutor committed prejudicial misconduct during closing argument by repeatedly implying that they committed other uncharged and unproven crimes. Houston-Sconiers and Roberts point to four alleged instances of improper argument.

"We review a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions." *State v. Boehning*, 127 Wn. App. 511, 519, 111 P.3d 899 (2005). "A prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury." *Boehning*, 127 Wn. App. at 519. "However, a prosecutor may not make

28

statements that are unsupported by the evidence and prejudice the defendant." *Boehning*, 127 Wn. App. at 519.

In the first allegedly improper argument, the prosecutor said: "We know that Mr. Houston-Sconiers, on the 14th of October, was in that same Cadillac displaying and holding the same firearm that was used in the robbery." 23 RP at 2234. Defense counsel objected, arguing that the prosecutor was misstating the evidence. On appeal, Houston-Sconiers argues that "[al]though the interior of the vehicle and the firearm resembled the Cadillac and silver gun later found under the seat, there was no testimony that they were in fact the same." Br. of Appellant (HS) at 28. No such testimony is required. The prosecutor's statement is proper argument because it constitutes a reasonable inference from the evidence presented. *See Boehning*, 127 Wn. App. at 519. The prosecutor did not commit misconduct.

In the second allegedly improper argument, the prosecutor said, "[T]hese crimes occurred, the ones that we know about, in this location and general area." 23 RP at 2229. Defense counsel did not object.

A reasonable juror could infer from the prosecutor's statement that Houston-Sconiers and Roberts may have committed additional crimes. This argument is improper. It is also prejudicial because it encourages the jury to convict Houston-Sconiers and Roberts based on facts not admitted into evidence. However, because neither counsel objected, any misconduct is waived unless it was so flagrant and ill-intentioned that no curative jury instruction could have cured the resulting prejudice. *Emery*, 174 Wn.2d at 760-61. We conclude that this comment does not meet this heightened standard.

In *Boehning*, we concluded that the prosecutor's statements were flagrant and ill-intentioned where, in closing argument, the prosecutor told the jury that some specific charges had

been dismissed because the juvenile victim in a sexual assault case "was not able . . . to talk with this group of strangers as well as she was able to do it one-on-one in the past," she "didn't want to talk about this as much as she was willing to talk about it before." 127 Wn. App. at 519. The prosecutor then went on to tell the jury that "there's an inference that she must have said something a little bit more, because you heard about some other charges." *Boehning*, 127 Wn. App. at 520. Here the prosecutor's passing reference to potential additional crimes is substantially different from the prosecutor's multiple references to specific dismissed crimes in *Boehning*.

Furthermore, we evaluate potential misconduct during closing argument in the context of the entire argument and the jury instructions. *Boehning*, 127 Wn. App. at 519. Prior to closing arguments, the trial court instructed the jury that its decision must be made solely based on the evidence presented; it must disregard any remark, statement, or argument not supported by the evidence; and, that the lawyers' statements are not evidence. The prosecutor also told the jury that his closing is not evidence, it is argument. And finally, Houston-Sconiers's counsel told the jury that there was no evidence of other uncharged crimes and that no inferences should be drawn from the prosecutor's reference to other crimes:

> Well, the "crimes that we know about" is inflammatory language. They're the crimes that are charged. If the State knew about other crimes, they'd be charged. He says "the crimes that we know about" because he wants to scare you. He wants to frighten you into thinking that these guys, Mr. Houston-Sconiers and Mr. Roberts, were on some type of rampage and that they must have done other things that we just don' t know about. And that, boy, you better convict them because who knows what these little terrors did that night. Who knows?
> That's not how we convict people in this society; it's just not. We convict them based on evidence beyond a reasonable doubt. We don't convict them on innuendo. We don't scare people into convicting people. It's not the American way, and you're not going to fall for that.

23 RP at 2305-06.

We conclude that there was not a substantial likelihood that the prosecutor's fleeting remark affected the jury's verdict to the extent that a curative instruction could not have cured the resulting prejudice. *See In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012).

In the third allegedly improper argument, the prosecutor said, "[G]uess what, there's two backpacks in that car that can't be identified . . . How did those get in there and why are they in there?" 23 RP at 2343. Defense counsel objected stating, "Objection, Your Honor. These could belong to the perpetrators. They could have been there a long time. Counsel is using them to suggest other acts of misconduct that are completely improper." 23 RP at 2343.

The State contends that taken in context, the prosecutor was arguing that fingerprint evidence would not have indicated whether the backpacks found in the car were stolen, and if so, by whom. We are not persuaded by the State's argument; however, the prosecutor did not directly refer to uncharged crimes. The argument itself is ambiguous.

Assuming, but without deciding that the statement is improper, in the context of the entire argument and the jury instructions already discussed, *Boehning*, 127 Wn. App. at 519, we conclude that Houston-Sconiers has not shown a substantial likelihood that the remark affected the jury verdict. *See Glasmann*, 175 Wn.2d at 704.

In the fourth allegedly improper argument, the prosecutor refers to a statement made by Houston-Sconiers during a recorded jail phone call, which the jury heard. The prosecutor stated,

> It's so incredibly unlucky that he chose to make phone calls to his buddies and say n[*****] be snitching. I'm not telling you to do something to that—and I'm not going to say it again—but what happens to that happens to him. Oh, no, that's not a threat. Who is he talking about? Money,[16] by name. Is it a surprise that Money takes the stand after that, don't remember, don't remember, don't remember.

---

[16] "Money" is Tolbert's nickname. 18 RP at 1813.

23 RP at 2350. Defense counsel objected.

Houston-Sconiers argues that "[b]y using the substance of the recordings to imply that Houston-Sconiers was attempting to influence Tolbert's testimony, the prosecutor flagrantly and intentionally violated the trial court's ruling admitting the evidence for a limited purpose," and improperly "invited the jury to determine [guilt] based on improper" purposes. Br. of Appellant (HS) at 29. We disagree.

The prosecutor did not imply that the jury should convict Houston-Sconiers because he was guilty of other uncharged crimes, *e.g.*, witness tampering. The prosecutor merely drew a permissible inference from the evidence about the credibility of a witness. We reject Houston-Sconiers's allegation that the prosecutor invited the jury to determine guilt based on improper purposes.

In addition, we reject Houston-Sconiers's allegation that the prosecutor flagrantly and intentionally violated the trial court's ruling regarding the admissibility of the jail phone call recordings. The trial court admitted portions of the jail phone call recordings without stating any limitation on their use. Defense counsel asked the trial court to make a record as to the basis for admissibility for certain portions of recordings. The trial court stated:

> I believe they're relevant, as argued by the State, in regards to state of mind. And also I believe it ties in with his other statements that I have allowed in in which he discusses posting names on Facebook, giving him his state of mind that he hates snitches, which I believe is relevant. He may not be actively soliciting, but I think there's an inference that is relevant as to how he feels about these individuals. And I believe it ties in with other conversations that I have admitted in on part of that tape.

17 RP at 1654. It is not clear that the trial court admitted the jail phone calls for a limited purpose or that the court restricted the State from drawing inferences regarding the effect that Houston-Sconiers's expressed dislike for snitches would have on a witness's decision to testify against him.

Furthermore, defense counsel's objection to the prosecutor's argument was a narrative that, "The State has not levied any charges against my client that relate to that at all, and that is an improper allegation of misconduct." 23 RP at 2351. Defense counsel did not object regarding a violation of a trial court ruling. Because defense counsel did not make an objection, the alleged misconduct is waived unless the misconduct is so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. *See Emery*, 174 Wn.2d at 760-61. We conclude that Houston-Sconiers has not met this standard and the alleged misconduct is waived.

C.      Disparaging Defense Counsel

Houston-Sconiers and Roberts identify numerous statements in which they allege the prosecutor disparaged defense counsel in closing argument.

It is misconduct for the prosecutor to impugn defense counsel's role or integrity. *State v. Lindsay*, 180 Wn.2d 423, 431-32, 326 P.3d 125 (2014). For example, a prosecutor commits misconduct by referring to the defense's case as "bogus" or involving "sleight of hand," which implies "wrongful deception or even dishonesty in the context of a court proceeding." *Thorgerson*, 172 Wn.2d at 451-52. Similarly, a prosecutor commits misconduct by referring to the defense's closing argument as a "crock." *Lindsay*, 180 Wn.2d at 433-34. However, "the prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel." *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994).

Houston-Sconiers and Roberts allege that following two arguments, the prosecutor disparaged defense counsel in closing argument.

> Defense counsel just argued against herself in regard to the standard of proof in this abiding belief. She said that she hears prosecutors say frequently that this abiding belief issue is you have to believe it now, two weeks from now, five years now. And she suggested it's a difficult concept. One, it is not a difficult concept, and it is what it says it is. She did not completely tell you what that sentence says and what it applies to.

33

> . . . .
>
> Now, I want to directly address some of the things that defense counsel for Mr. Houston-Sconiers said that I absolutely 100 percent disagree with her statement as to what witnesses said and what the evidence was in this case. And some of the issues that were woven in there as if they're premises, they're true things, the foundation of what she's saying is true.

23 RP at 2335-36, 2338. Houston-Sconiers and Roberts did not object to either argument.

In the first statement, the prosecutor alleges an inconsistency in defense counsel's explanation of a jury instruction, and in the second, he expresses disagreement with defense counsel's recitation of the evidence presented at trial. Both are fair responses to defense counsel's closing argument. *See Russell*, 125 Wn.2d at 87.

> The third allegedly disparaging argument is as follows:
>
> We don't know, based on the forensics analysis, whether this hockey mask, so to speak, had nicks on it from her client's glasses, okay. What's the premise involved in that? What's the misrepresentation based on the evidence about that? And that is that the defendant wears glasses at all. He's in the video with the gun, no glasses. Nobody mentioned that he wears glasses, the officers, et cetera, but he has glasses on in the courtroom.

23 RP at 2345. Defense counsel objected, but the basis for the objection was not that the argument was disparaging. *See* 23 RP at 2345 ("Objection, your Honor. Counsel's assuming that it's he in the video, and no one asked any officer about his glasses. It's improper for the prosecutor to even suggest to the jury that my client's glasses are not prescription and not something that he needs, since they are.").

Here, the prosecutor was responding directly to defense counsel's argument that the hockey mask lacked forensic evidence, indicating that a person with glasses had been wearing it. The prosecutor was attempting to undermine defense counsel's argument by pointing out the faulty underlying premise—that Houston-Sconiers wore glasses. The prosecutor's use of the word "misrepresentation" may have been directed at the discrepancy between Houston-Sconiers

wearing glasses in the courtroom when there was no evidence presented that Houston-Sconiers wore glasses on Halloween or on other occasions. But even if the jury believed the prosecutor accused defense counsel of misrepresenting a fact, this statement is of minor significance in the context of the entire trial. It is also significant that trial counsel did not object to the statement on the basis now argued. It cannot be said that the argument was flagrant and ill-intentioned or that an instruction could not have cured any resulting prejudice. *See Glasmann*, 175 Wn.2d at 704.

Finally, Houston-Sconiers and Roberts argue that the following statements disparaged the role of defense counsel by implying that contrary to defense counsel's role, the prosecutor's role is to elicit the truth and by urging the jury to disregard the defense because defense counsel's motives were suspect and impure:

> When defense counsel for Mr. Roberts said among the demeanors that you're to consider other than the witnesses are the people in the courtroom and the participants, that's not accurate either. That's to involve sympathy. That's to suggest that when I'm being very aggressive with Ms. Bush, that you're to judge me. . . . . I treated [Bush] with respect. You may disagree. But I was strong for a reason because when individuals get on the stand, my job is to challenge the evidence so that you can ultimately decide whether somebody's credible or not.
> . . . .
> So in order to get to that point, my job and the process as an advocate as a person, as I said, to challenge the evidence is not to take what Ms. Bush says and just, okay, Ms. Bush, open-ended question, what's your answer to this? Thank you very much. It's to challenge it. And that's the only way you discover, for instance, that she's been talked to during her testimony by somebody.

23 RP 2346, 2348. Defense counsel did not object to any of these statements.

The prosecutor's arguments simply do not disparage defense counsel. And, to the extent that the arguments referred to defense counsel at all, the prosecutor merely responded to defense counsel's apparent suggestion that the jury should consider the prosecutor's demeanor as evidence. The prosecutor is entitled to make a fair response to the arguments of defense counsel. *Russell*, 125 Wn.2d at 87. We conclude that the prosecutor committed no misconduct.

35

D.      Prosecutor's Personal Opinion

Finally, Houston-Sconiers and Roberts argue that the prosecutor expressed his personal opinion that Houston-Sconiers and Roberts committed the robberies, that Houston-Sconiers was guilty, and about a witness's credibility.  We disagree.

It is improper for a prosecutor to express an independent, personal opinion as to the credibility of a witnesses or the guilt or innocence of a defendant.  *State v. McKenzie*, 157 Wn.2d 44, 53, 134 P.2d 221 (2006); *State v. Reed*, 102 Wn.2d 140, 145, 684 P.2d 699 (1984).

> To determine whether the prosecutor is expressing a personal opinion of the defendant's guilt, independent of the evidence, a reviewing court views the challenged comments in context: "It is not uncommon for statements to be made in final arguments which, standing alone, sound like an expression of personal opinion.  However, when judged in the light of the total argument, the issues in the case, the evidence discussed during the argument, and the court's instructions, it is usually apparent that counsel is trying to convince the jury of certain ultimate facts and conclusions to be drawn from the evidence.  Prejudicial error does not occur until such time as it is *clear and unmistakable that counsel is not arguing an inference from the evidence, but is expressing a personal opinion.*"

*McKenzie*, 157 Wn.2d at 53-54 (quoting *State v. Papadopoulos*, 34 Wn. App. 397, 400, 662 P.2d 59 (1983)) (emphasis added).

First, Houston-Sconiers and Roberts allege that the prosecutor expressed his personal opinion about Tolbert's credibility by reminding Tolbert during his testimony that he could be charged with perjury.  We disagree.  The prosecutor asked Tolbert, "But you can be charged with perjury if you don't tell the truth?"  18 RP at 1822.  Contrary to Houston-Sconiers and Roberts's argument, the prosecutor asked this question, not as a way to convey his personal opinion of Tolbert's credibility but during a series of questions about Tolbert's charges being dismissed, the court granting him transactional immunity, and whether he understood the effect of that immunity regarding potential future charges.  The prosecutor's inquiry as to whether Tolbert understood that he could still face perjury charges for untruthful testimony was not an expression of the

36

prosecutor's personal opinion about the witness, but rather an appropriate follow-up question related to the dismissal of Tolbert's charges and the subsequent grant of immunity to him.

Next, Houston-Sconiers and Roberts allege that the prosecutor expressed his personal opinion about their guilt by the way he questioned Tolbert about Tolbert's involvement in any robberies. The prosecutor asked Tolbert a series of questions: whether he committed a robbery on Halloween, whether he was present when a robbery was committed, and whether he was sure of that. The prosecutor briefly stood behind Houston-Sconiers and Roberts and pointed to them when he was asking Tolbert about his involvement in any robberies. The questions the prosecutor posed to Tolbert were not improper and they did not express a personal opinion about whether Houston-Sconiers and Roberts committed the charged robberies. It was important for the prosecutor to ask Tolbert specific clarifying questions because Tolbert had been an uncooperative and evasive witness. Tolbert changed his answer to the above-mentioned questions from "no" to "I don't remember." 18 RP at 1859. He explained that he had to fix his answer to avoid lying under oath. And, Tolbert had previously testified that he did not remember the events of Halloween and that the only reason he knew that he did not rob anyone was because he did not have any charges pending. The prosecutor's questions did not express a personal opinion about whether Houston-Sconiers and Roberts committed the robberies.

Finally, Houston-Sconiers and Roberts argue that the prosecutor expressed a personal belief in Houston-Sconiers's guilt based on the following statement in closing argument: "We know from that evidence there is no issue that Mr. Houston-Sconiers is guilty of every crime charged, period." 23 RP at 2235. Although the prosecutor used the word "we," which would include himself, it is clear that the prosecutor was making an argument about Houston-Sconiers's

guilt based *on the evidence*, rather than on an independent personal opinion. *See McKenzie*, 157 Wn.2d at 53-54. Therefore, the statement is not improper.

VI.    DISCRETIONARY LFOs

Houston-Sconiers and Roberts argue that the trial court acted outside its statutory authority by imposing discretionary LFOs without first considering their abilities to pay such obligations.

As a threshold matter, the State argues that Houston-Sconiers and Roberts failed to object to the LFOs below and therefore cannot raise the issue for the first time on appeal. At sentencing, Houston-Sconiers and Roberts represented to the trial court that they had no ability to pay LFOs and requested that the trial court not impose any discretionary LFOs. Therefore, Houston-Sconiers and Roberts clearly preserved this issue.

The State also argues that Houston-Sconiers's and Roberts's challenge to discretionary LFOs is not ripe for review because the State has not attempted to enforce the orders. Our Supreme Court recently rejected this argument. *State v. Blazina*, 182 Wn.2d 827, 832 n.1, 344 P.3d 680 (2015). Because the issue is both preserved and ripe, we reach the merits of Houston-Sconiers's and Roberts's LFO claims.

The sentencing court must consider Houston-Sconiers's and Roberts's present or likely future ability to pay.

> The court shall not order a defendant to pay costs unless the defendant is or will be able to pay them. In determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose.

RCW 10.01.160(3).

In *Blazina*, our Supreme Court concluded that the record must reflect that the sentencing court made an individualized inquiry into the defendant's current and future ability to pay before the court imposes discretionary LFOs. 182 Wn.2d at 838. When determining a defendant's ability

38

to pay, the sentencing court must consider important facts such as incarceration and a defendant's other debts, including restitution. *Blazina*, 182 Wn.2d at 838. If a sentencing court imposes discretionary LFOs without inquiring into a defendant's ability to pay, the matter should be remanded to the trial court for a new sentence hearing. *Blazina*, 182 Wn.2d at 839.

Here, Houston-Sconiers requested that the trial court not impose discretionary LFOs because he had no ability to pay them. Houston-Sconiers represented that he had never worked and was "as poor as a church mouse." 25 RP at 2396. Based on these representations, the trial court waived $200 in discretionary court costs and reduced the attorney fee recoupment from the standard $1,500 to $500. The judge explained that he was not entirely waiving the attorney fee recoupment because he thought that there should be a minimum amount that Houston-Sconiers be required "to [pay] back to the taxpayers for [his] defense." 25 RP at 2403.

On appeal, Houston-Sconiers argues that the trial court did not concern itself with his ability to pay. We disagree. The record shows that the trial court considered Houston-Sconiers's ability to pay and significantly reduced the discretionary LFOs the State recommended. In light of this record, we conclude that the trial court did conduct an individualized assessment of Houston-Sconiers's ability to pay.

Roberts also requested that the trial court not impose discretionary LFOs. Roberts represented to the trial court that he was an unemployed, indigent minor, who had no ability to pay. Roberts's sentencing immediately followed Houston-Sconiers's sentencing and occurred in the same proceeding. With regard to LFOs, the trial court stated, "I will follow the same . . . court costs, fines, [and attorney fee] recoupment . . . as recommended earlier." 25 RP at 2418. In fact, the trial court imposed the same discretionary costs on Roberts as it did on Houston-Sconiers.

39

The trial court's imposition of the same amount of LFOs on Roberts as on Houston-Sconiers seems to weigh against the trial court having made an individualized inquiry. On the other hand, by imposing the same amount of discretionary LFOs on Roberts as it did on Houston-Sconiers, the trial court considered Roberts's own inability to pay. Both Roberts and Houston-Sconiers had similar arguments relating to their ability to pay. Therefore, it does not necessarily follow that because the trial court imposed the same amount of discretionary LFOs on both Houston-Sconiers and Roberts, it did not make an individualized inquiry into each of their ability to pay. Rather, the trial court's decision to reduce Roberts's discretionary LFOs from the standard amount demonstrates that the trial court also considered Roberts's individualized ability to pay.

We conclude that trial court conducted an individualized assessment with regard to both Houston-Sconiers's and Roberts's ability to pay discretionary LFOs. Therefore, Houston-Sconiers's and Roberts's LFO claims fail.

IV.     HOUSTON-SCONIERS'S PRP

Houston-Sconiers filed a separate PRP that we consolidated with his direct appeal. In his PRP, Houston-Sconiers contends that (1) the trial court abused its discretion when it refused to grant an evidentiary hearing on his motion to suppress evidence, (2) the trial court violated his right to be present at all critical stages of the trial, (3) the trial court erred by refusing to give his proposed "missing witness" instruction to the jury, and (4) numerous instances of prosecutorial misconduct deprived him of a fair trial. We deny Houston-Sconiers's petition.

A.      PRP Standard of Review

We consider the arguments raised in a PRP under one of two different standards, depending on whether the argument is based on constitutional or nonconstitutional grounds. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671-72, 101 P.3d 1 (2004). A petitioner raising constitutional

error must show that the error caused actual and substantial prejudice. *Davis*, 152 Wn.2d at 671-72. In contrast, a petitioner raising nonconstitutional error must show a fundamental defect resulting in a complete miscarriage of justice. *In re Pers. Restraint of Elmore*, 162 Wn.2d 236, 251, 172 P.3d 335 (2007).

Additionally, Houston-Sconiers must support his claims of error with a statement of the facts on which his claim of unlawful restraint is based and the evidence available to support his factual allegations. RAP 16.7(a)(2); *In re Pers. Restraint of Williams*, 111 Wn.2d 353, 365, 759 P.2d 436 (1988); *see also In re Pers. Restraint of Cook*, 114 Wn.2d 802, 813-14, 792 P.2d 506 (1990). Houston-Sconiers must present evidence showing his factual allegations are based on more than mere speculation, conjecture, or inadmissible hearsay. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). Bald assertions and conclusory allegations are not sufficient. *Rice*, 118 Wn.2d at 886.

B.      Evidentiary Hearing

Houston-Sconiers argues that the trial court erred by refusing to hold an evidentiary hearing on his motion to suppress physical evidence found in the Cadillac where the parties disputed whether Houston-Sconiers and Roberts had permission to be in the Cadillac. The State argues that the trial court properly exercised its discretion to deny the evidentiary hearing because the only disputed fact was irrelevant to the trial court's analysis. We agree with the State.

CrR 3.6(a) provides, "The court shall determine whether an evidentiary hearing is required based upon the moving papers." "The trial court has discretion whether to take oral testimony on a motion to suppress." *State v. Kipp*, 171 Wn. App. 14, 28, 286 P.3d 68 (2012), *reversed on other grounds*, 179 Wn.2d 718, 317 P.3d 1029 (2014). A trial court abuses its discretion if its decision is manifestly unreasonable or rests on untenable grounds. *Kipp*, 171 Wn. App. at 28.

Here, the police arrested Houston-Sconiers and Roberts in an inoperable Cadillac parked in Worthey's backyard. Worthey, who was responsible for watching the Cadillac for her son, did not give Houston-Sconiers and Roberts permission to be on her property or in the Cadillac. Worthey consented to a search of the Cadillac.

Houston-Sconiers and Roberts requested an evidentiary hearing to demonstrate that they had permission to be in the Cadillac. The defense made an offer of proof and told the trial court that Worthey's son, Robert Johnson, would testify he owned the Cadillac and had given permission to Houston-Sconiers and Roberts to be in the car. The trial court denied the evidentiary hearing because it concluded that Johnson's testimony was not necessary to decide the suppression motion. Ultimately, the trial court concluded that regardless of whether Houston-Sconiers and Roberts had Johnson's permission to sit in the Cadillac, they did not have a reasonable expectation of privacy in the inoperable vehicle parked on Worthey's property because they did not have her permission to be on her property; and even if they had a reasonable expectation of privacy, Worthey had legitimate authority to give consent to search the Cadillac left under her custody and control.

Houston-Sconiers argues that the trial court erred by denying an evidentiary hearing on the suppression motion, but he fails to show actual prejudice or a miscarriage of justice resulting from the alleged error. He fails to provide argument and citation to authority showing that Johnson's testimony would have resulted in the trial court granting his suppression motion. Accordingly, his claim fails.

C.     Right to Be Present

Houston-Sconiers next argues that we must reverse his convictions and remand for a new trial because the trial court conducted an open court session without him being present. Specifically, he contends that on July 8, while he was absent from court, the court conducted voir

dire, selected jurors, and discussed whether his counsel could proceed in the face of a medical emergency. The transcript shows that voir dire and jury selection occurred on the morning of July 8, 2013. Houston-Sconiers does not identify any evidence showing that he was not present during that session.

When the trial court reconvened in the afternoon, it determined that Houston-Sconiers's counsel required immediate medical attention for an injury sustained over the lunch hour. The court excused counsel to seek medical attention and advised her to call and update the court about her situation. Counsel called the court and reported that she required stitches and would need to go home. The court then decided that it would not hold session that afternoon because Houston-Sconiers's counsel could not be present. The court adjourned for the day and excused the jury. Houston-Sconiers was not present during any of the proceedings or discussions that occurred on the afternoon of July 8.

On July 9, the trial court updated Houston-Sconiers and Roberts, on the record in open court, about the previous afternoon's discussions that were held outside their presence. Houston-Sconiers's counsel first confirmed that the trial court provided an accurate rendition of the previous afternoon's events and then objected to the fact that her client was not present. In response, the trial court explained that it would not allow Houston-Sconiers to be present in the courtroom without his counsel, no substantive issues were discussed, and only procedural and scheduling issues relating to counsel's medical condition occurred.

The Washington Constitution grants criminal defendants "the right to appear and defend in person," WASH. CONST. art. I, § 22, meaning that an accused person has a constitutional right to be present "when evidence is being presented" and "'whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.'" *In re Pers.*

*Restraint of Lord*, 123 Wn.2d 296, 306, 868 P.2d 835 (1994) (quoting *United States v. Gagnon*, 470 U.S. 522, 526, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985)). A defendant, then, has the right to be present at every critical stage of a criminal proceeding. *State v. Bremer*, 98 Wn. App. 832, 834, 991 P.2d 118 (2000). But a criminal defendant "does not have a right to be present during . . . conferences between the court and counsel on legal matters, at least where those matters do not require a resolution of disputed facts." *Lord*, 123 Wn.2d at 306 (citations omitted); *see also State v. Irby*, 170 Wn.2d 874, 881, 246 P.3d 796 (2011) (stating there is no right to be present when a defendant's "'presence would be useless, or the benefit but a shadow'") (quoting *Malloy v. Hogan*, 378 U.S. 1, 106-07, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)).

The trial court's discussion with counsel on strictly procedural and scheduling matters related to defense counsel's unavailability to proceed was not a critical stage of the proceeding. Therefore, Houston-Sconiers's absence during the afternoon of July 8 did not violate his constitutional right to be present.

D.      Missing Witness Instruction

Houston-Sconiers asserts that the trial court erred by allowing hearsay testimony from Wright without instructing the jury on the missing witness instruction.[17] He alleges that failing to instruct the jury on the missing witness doctrine allowed the State to shift its burden of proof to the defense. Because Houston-Sconiers was not entitled to the instruction, his claim fails.

We review a trial court's denial of a defendant's proposed jury instruction for an abuse of discretion. *State v. Winings*, 126 Wn. App. 75, 86, 107 P.3d 141 (2005). A trial court abuses its

---

[17] We interpret Houston-Sconiers's argument as a challenge to the court's denial of his proposed missing witness instruction. To the extent Houston-Sconiers is repeating his direct appeal assignment of error—challenging the trial court's decision to allow Wright's hearsay testimony over Houston-Sconiers's confrontation clause objections—that issue is addressed above.

discretion if it exercises its discretion based on untenable grounds or for untenable reasons. *State v. Smith*, 124 Wn. App. 417, 428, 102 P.3d 158 (2004).

A missing witness instruction informs the jury that it may infer a person's testimony would have been unfavorable to a party. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 5.20, at 177 (3d ed. 2008). Generally, a four part test is employed to determine if a missing witness instruction should be given. *State v. Montgomery*, 163 Wn.2d 577, 598-99, 183 P.3d 267 (2008). One of the prongs is that the missing witness is particularly under the control of the party, in this case the State. *Montgomery*, 163 Wn.2d at 598-99. For purposes of this case, we need only address this part of the test.

Houston-Sconiers joined his codefendant's request for a missing witness instruction relating to Wright. The State argued that the doctrine did not apply because Wright was not peculiarly available to the State. The State represented that it could not locate Wright for trial despite its attempts to do so. Its efforts included requesting and obtaining a material witness warrant for him. Thus, because the State showed that Wright was not particularly under their control, the trial court did not abuse its discretion in refusing to give a missing witness instruction. Accordingly, Houston-Sconiers's claim fails.

E.    Prosecutorial Misconduct

Houston-Sconiers makes seven additional allegations of prosecutorial misconduct. Some of the allegations are recast from his direct appeal.

1.    Family Bias

Houston-Sconiers contends that the prosecutor's personal bias led to this prosecution. Houston-Sconiers argues that the State believed he came from a bad family and would continue to commit worse crimes as he got older. In order to succeed in his PRP, Houston-Sconiers must show

that the alleged prosecutorial misconduct caused actual and substantial prejudice. *See Elmore*, 162 Wn.2d at 251. He fails in this endeavor.[18]

Houston-Sconiers relies on an extra-record declaration from his trial counsel, Barbara Corey. Corey declares that the prosecutor refused to negotiate because of her client's family background. She also declares that the prosecutor told her that Houston-Sconiers came from a "very bad family," that he deserved no leniency, and that he would continue to commit worse crimes as he got older. PRP Appendix C. Finally, Corey contends that the prosecutor said that he wanted to lock up Houston-Sconiers for as long as he could.

The hearsay statements attributed to the prosecutor do not establish that Houston-Sconiers's prosecution was based on personal bias. The record reveals that the prosecutor took many actions inconsistent with the biased prosecution alleged by Houston-Sconiers. For example, the prosecutor did negotiate with Houston-Sconiers; he offered Houston-Sconiers a plea agreement that would have resulted in 17.5 years' confinement, far less than the 31 years' confinement the court ultimately imposed. Furthermore, at the end of his case-in-chief, the prosecutor stipulated that the State failed to prove Houston-Sconiers committed robbery in the first degree as charged in count VIII. Finally, at sentencing, the prosecutor recommended an exceptional sentence below the standard range, which included only the statutorily-mandated confinement attributable to the firearm enhancements. We conclude that Houston-Sconiers fails to show "personal bias" that resulted in any prejudice. And, he fails to show any personal bias at all.

---

[18] Houston-Sconiers cites to *In re Pers. Restraint of Vandervlugt*, 120 Wn.2d 427, 842 P.2d 950 (1992), for support, but that case does not advance his claim because it did not concern an allegation of prosecutorial misconduct. Rather, in *Vandervlugt*, our Supreme Court reiterated that a trial court could not use a finding of future dangerousness to impose an exceptional sentence for a nonsexual offense. 120 Wn.2d at 434-35.

2.      Alluding to Defense Counsel as Dishonest

Next Houston-Sconiers contends that the prosecutor committed misconduct by alluding to defense counsel's dishonesty.   But the statement to which Houston-Sconiers refers, the prosecutor's allegation that defense counsel made a misrepresentation to the trial court, was made to the court outside the jury's presence.   Houston-Sconiers fails to show how the prosecutor's remark outside the jury's presence constituted prejudice. Accordingly, his claim fails.

3.      Burden-Shifting

Next Houston-Sconiers contends that the prosecutor committed misconduct by shifting the burden of proof by pointing out that certain witnesses did not testify in court.   He directs us to a portion of closing argument in which the prosecutor discusses the credibility of Roberts's "alibi" witnesses.   *See* RP at 2239-40.   The prosecutor pointed out that although Roberts's girlfriend testified that Roberts's mother was also present at the house at a critical time, his mother did not testify.

"A criminal defendant has no burden to present evidence, and it is error for the State to suggest otherwise."   *Montgomery*, 163 Wn.2d at 597-98.   Here, the prosecutor implied that Roberts's mother did not testify because her testimony would not have been consistent with Bush's alibi testimony.   Assuming without deciding that the prosecutor's statement was improper because it implies that Roberts had a burden to prove his innocence, Houston-Sconiers has not shown that he was prejudiced by the prosecutor's argument.   The prosecutor's argument was about Roberts's failure to produce his mother's testimony to back up his alibi.   It had nothing to do with Houston-Sconiers.

4.      Misstating the Evidence

Houston-Sconiers's next allegation of misconduct is that the prosecutor misstated the evidence and referenced things that witnesses did not say. Houston-Sconiers directs us to five pages of the prosecutor's closing argument without further discussion. He does not identify which arguments he finds objectionable and does not compare the prosecutor's alleged misstatements with the witnesses' actual testimony. Such bare allegations cannot sustain his burden to demonstrate actual prejudice relating to this claim.

5.      Appealing to Racial Bias

Houston-Sconiers contends that the prosecutor appealed to racial bias in his closing argument by using racially derogatory language and suggesting to the jury that a witness could not remember due to a "snitch code." PRP at 18. The allegedly improper argument is as follow:

> It's so incredibly unlucky that he chose to make phone calls to his buddies and say n[*****] be snitching. I' m not telling you to do something to that—and I'm not going to say it again— but what happens to that happens to him. Oh, no, that's not a threat. Who is he talking about? Money, by name. Is it a surprise that Money takes the stand after that, don't remember, don't remember, don't remember.

23 RP at 2350.

Houston-Sconiers relies on *State v. Monday*, 171 Wn.2d 667, 257 P.3d 551 (2011). In *Monday*, our Supreme Court reversed the defendant's convictions because the prosecutor improperly injected racial prejudice into the trial proceedings by repeatedly invoking an alleged African American anti-snitch code to discount the credibility of witnesses, stating "black folk don't testify against black folk." 171 Wn.2d at 678. The prosecutor's appeal to racism permeated the trial. For example, the prosecutor began referring to the "police" as "po-leese" to draw the jury's attention to the fact that a witness was African American and to emphasize the prosecutor's contention that "black folk don't testify against black folk." *Monday*, 171 Wn.2d at 679. The

Supreme Court in *Monday* announced that the constitutional harmless error standard applies "when a prosecutor flagrantly or apparently intentionally appeals to racial bias in a way that undermines the defendant's credibility or the presumption of innocence." 171 Wn.2d at 680.

Here, the prosecutor did not use racial bias to undermine Houston-Sconiers's presumption of innocence or the credibility of witnesses. Although the prosecutor used racially derogatory language in his closing, he did so by repeating Houston-Sconiers's own statement from a recorded jail conversation. The State's argument went to show Houston-Sconiers's state of mind, which was at odds with the defense's theory that this case involved a case of mistaken identity and that the State's witnesses were framing him. The prosecutor used the defendant's own statement, which included racially derogatory language, to draw permissible inferences about Houston-Sconiers's guilt. This use of language is fundamentally different from *Monday*, where the prosecutor relied on racially derogatory language to undermine the credibility of witnesses based on racial stereotypes. We conclude that the prosecutor's argument here was not improper.

6.      Improper Demonstration

Houston-Sconiers argues that the prosecutor committed misconduct by using one of the masks and the firearm with the lights dimmed to illustrate the scene of the crimes. At trial, defense counsel objected to the demonstration, and argued that it lacked foundation, misrepresented the facts, and did not help the jury. But in his PRP, Houston-Sconiers claims the prosecutor used the demonstration in an attempt to inflame the jury to be biased against him. This bare allegation is unsupported by the record. The prosecutor explained, and the trial court agreed, that the demonstration went to whether or not a witness could tell the color of the gun's grips under the circumstances discussed. The illustration and corresponding inquiry directly responded to defense counsel's cross-examination.

Houston-Sconiers relies on *State v. Gregory*, 158 Wn.2d 759, 866-67, 147 P.3d 1201 (2006). In *Gregory*, the Supreme Court held that a prosecutor engaged in misconduct during closing argument in the penalty phase of a murder trial by discussing prison conditions, which clearly violated the trial court's order excluding any reference to conditions that exist in prison. 158 Wn.2d at 866-67. Houston-Sconiers does not explain how the prosecutor's demonstration is analogous to the situation in *Gregory*. Here, the trial court did not prohibit the prosecutor from making the demonstration.

Houston-Sconiers does not provide authority or persuasive reasoning demonstrating that the prosecutor acted improperly by using the trial exhibits and dimmed lights to illustrate how the lighting conditions and the mask's obstruction may have affected a witness's perception. It is not clear how this demonstration inflamed the jury or created bias. Accordingly, we reject his claim.

7. "Advocating On Behalf of the Public"

Finally, Houston-Sconiers asserts that the prosecutor committed misconduct by telling the jury that he was advocating on behalf of the public. He also claims that the prosecutor cannot play to the jurors' emotions by stating that he is an "advocate for justice." PRP at 21. Houston-Sconiers points us to a single page of record to support his allegation. It appears that Houston-Sconiers is referring to the following selection:

> So in order to get to that point, my job and the process as an advocate as a person, as I said, to challenge the evidence is not to take what Ms. Bush says and just, okay, Ms. Bush, open-ended question, what's your answer to this? Thank you very much. It's to challenge it. And that's the only way you discover, for instance, that she's been talked to during her testimony by somebody who was in here.

23 RP at 2348. Contrary to Houston-Sconiers's allegation, the prosecutor did not claim that he was an advocate on behalf of the public or an advocate for justice. Therefore, Houston-Sconiers's claim is rejected.

45374-6-II / 45414-9-II / 47085-3-II

We affirm Houston-Sconiers's and Roberts's convictions, and we deny Houston-Sconiers's PRP.

_____
Melnick, J.

I concur:

_____
Johanson, J.

51

BJORGEN, J. (dissenting) — For crimes committed when they were 17 and 16 years old, respectively, the State charged Zyion Houston-Sconiers and Treson Roberts with multiple counts of first degree robbery and other offenses and alleged that each were armed with a firearm while committing the crimes. With that, RCW 13.04.030(1)(e)(v)(A) required that the juvenile court decline jurisdiction and that the defendants be tried in adult criminal court. The jury found the defendants guilty of a number of the charged counts and found that each was armed with a firearm during a number of the crimes. With that, RCW 9.94A.533 required the court to sentence Houston-Sconiers to 31 years' confinement, and Roberts to 28 years' confinement, for the firearm enhancements alone. The mandatory declination of juvenile court jurisdiction thus led, in these circumstances of guilt, to the mandatory forfeiting of a 17 year old's freedom for the next 31 years of life. To effectively close off a life in this manner, as though by the workings of a machine, offends the logic, although not the holdings of a series of recent United States Supreme Court decisions. Under that logic, the mandatory declining of juvenile court jurisdiction cannot be reconciled with the Eighth Amendment to the United States Constitution. For that reason, I dissent.

In 1988 the United States Supreme Court decided *Thompson v. Oklahoma*, 487 U.S. 815, 108 S. Ct. 2687, 101 L. Ed 2d 702 (1988), which set aside the death sentence for a murder committed at age 15. The four-justice plurality concluded that the cruel and unusual punishment prohibition of the Eighth Amendment prohibits the execution of a person who was under 16 years of age at the time of the offense. Justice O'Connor concurred in the judgment, but on the grounds that the Oklahoma statute specified no minimum age at which the commission of a crime could lead to the offender's execution. *Thompson*, 487 U.S. at 857-58. The following year, in *Stanford v. Kentucky*, 492 U.S. 361, 369-73, 109 S. Ct. 2969, 106 L. Ed. 2d 306 (1989),

the Court, relying on contemporary standards of decency and the lack of a national consensus, concluded that the Eighth and Fourteenth Amendments did not prohibit the execution of juvenile offenders for murder committed when over the age of 15 and under the age of 18.

In 1996, relying in part on *Stanford*, our state Supreme Court upheld the mandatory declination statute against an Eighth and Fourteenth Amendment challenge. *In re Boot*, 130 Wn.2d 553, 570, 925 P.2d 964 (1996). The court answered *Thompson*'s statement that "less culpability should attach to a crime committed by a juvenile," *Thompson*, 487 U.S. at 835, by noting in the context of its substantive due process analysis that *Thompson* was a capital case and holding:

> "There is no analogy between the death penalty and life imprisonment without parole. As the Supreme Court has observed, 'the penalty of death is qualitatively different from a sentence of imprisonment, *however long*."

*Boot*, 130 Wn.2d at 572 (alteration in original) (internal quotation marks omitted) (quoting *State v. Grisby*, 97 Wn.2d 493, 498, 647 P.2d 6 (1982)).

By 2005, the landscape had shifted. That year, the United States Supreme Court held that the Eighth and Fourteenth Amendments forbid executing those who were under the age of 18 when their crimes were committed. *Roper v. Simmons*, 543 U.S. 551, 578-79, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). Five years later, in *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), *as modified*, (July 6, 2010), the Court extended the rationale of *Roper* to hold that the Eighth Amendment prohibits a sentence of life imprisonment without possibility of parole for a crime other than homicide committed by a juvenile. Two years later, the doctrinal logic of *Roper* and *Graham* led to the holding of *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d (2012), *on remand*, 148 So.3d 78 (Nov. 08, 2013), that the Eighth

Amendment prohibits mandatory sentences of life imprisonment without possibility of parole for crimes committed while under the age of 18.

From *Thompson* through *Stanford* and to *Miller*, the signature of these cases is a willingness to abandon or extend prior holdings when needed to serve their underlying rationale: a willingness informed by advancing neurological and psychological knowledge, as well as ascending standards of decency. None of these cases, however, invalidate the mandatory declining of juvenile court jurisdiction. In addition, each of them deal with the most severe penalties possible, which are not the necessary result of a mandatory declining of juvenile court jurisdiction. Nonetheless, the geology of these decisions, especially *Roper* and *Miller*, leads to the conclusion, I believe, that the mandatory declining of juvenile court jurisdiction offends the Eighth Amendment.

The Eighth Amendment right to be free of excessive sanctions, according to *Roper*, flows from the basic precept that "'punishment for crime should be graduated and proportioned to [the] offense.'" *Roper*, 543 U.S. at 560 (alteration in original) (quoting *Atkins v. Virginia*, 536 U.S. 304, 311, 122 S. Ct. 2242, 153 L. Ed. 2d (2002)). In Eighth Amendment analysis, the Court has "affirmed the necessity of referring to 'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual." *Roper*, 543 U.S. at 561 (plurality opinion) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958). Accordingly, the Court specified that its

> beginning point is a review of objective indicia of consensus, as expressed in particular by the enactments of legislatures that have addressed the question. These data give us essential instruction. We then must determine, in the exercise of our own independent judgment, whether the death penalty is a disproportionate punishment for juveniles.

*Roper*, 543 U.S. at 564.

After reviewing legislative enactments and other indicia of consensus, *Roper* turned to the identification of three general differences between adults and juveniles central to an Eighth Amendment analysis. First, juveniles more often display "'[a] lack of maturity and an underdeveloped sense of responsibility,'" often resulting in "'impetuous and ill-considered actions and decisions.'" *Roper*, 543 U.S. at 569 (alteration in original) (quoting *Johnson v. Texas*, 509 U.S. 350, 367, 113 S. Ct. 2658, 125 L. Ed. 2d 290 (1993)). This susceptibility means that their "'irresponsible conduct is not as morally reprehensible as that of an adult.'" *Roper*, 543 U.S. at 570 (quoting *Thompson*, 487 U.S. at 835). Second, juveniles "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Roper*, 543 U.S. at 569. This "vulnerability and comparative lack of control over their immediate surroundings" give juveniles "a greater claim than adults to be forgiven for failing to escape negative influences." *Id.* at 570. Finally, "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles, less fixed." *Id.* at 570. Thus, "it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character." *Id.* at 570.

In finding these differences, also relied on in *Miller* and *Graham*, the Court drew on developments in psychology and neuroscience showing "'fundamental differences between juvenile and adult minds—for example, in 'parts of the brain involved in behavior control.'"

*Miller*, 132 S. Ct. at 2464 (quoting *Graham*, 530 U.S. at 89-90).[19]  These differences, the Court recognized, both lessened a juvenile's moral culpability, *Roper*, 543 U.S. at 571, and enhanced the prospect of reformation, *Miller*, 132 S. Ct. at 2465.  With these differences, each decision recognized that the penological justifications for imposing the harshest sentences were diminished for juveniles.  *See Miller*, 132 S. Ct. at 2465.

*Miller* also noted that *Graham* had treated "'juvenile life sentences as analogous to capital punishment.'"  *Miller*, 132 S. Ct. at 2467 (quoting *Graham*, 530 U.S. at 89-90) (Roberts, C.J., concurring)).  Accordingly, *Miller* also relied on a line of precedents demanding individualized sentencing when imposing the death penalty.  *Miller*, 132 S. Ct. at 2467-68.  Drawing on the difference between adults and juveniles noted above, the emerging neuroscience confirming those differences, and the individualized sentencing required in death penalty cases, *Miller* concluded that

> in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult.  To recap:  Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences.  It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal

---

[19] Our state Supreme Court has also recognized these neurological distinctions.  In *State v. O'Dell*, 183 Wn.2d 680, ¶ 48 n.5, 358 P.3d 359 (2015) (alteration in original), the court noted the following recent findings:

> Terry A. Maroney, *The False Promise of Adolescent Brain Science in Juvenile Justice*, 85 NOTRE DAME L. REV. 89, 152 & [152] n.252 (2009) (collecting studies); *MIT Young Adult Development Project: Brain Changes*, MASS. INST. OF TECH., http://hrweb.mit.edu/worklife/youngadult/brain.html (last visited Aug. 4, 2015) ("The brain isn't fully mature at . . . 18, when we are allowed to vote, or at 21, when we are allowed to drink, but closer to 25, when we are allowed to rent a car."); Jay N. Giedd, *Structural Magnetic Resonance Imaging of the Adolescent Brain*, 1021 ANN. N.Y. ACAD. SCI. 77 (2004) ("The dorsallatera1 prefrontal cortex, important for controlling impulses, is among the latest brain regions to mature without reaching adult dimensions until the early 20s" (formatting omitted)).

> or dysfunctional. . . .   And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

*Miller*, 132 S. Ct. at 2468.  For these reasons, the Court held that imposing a mandatory life sentence without possibility for parole on juvenile offenders violates the Eighth Amendment.

Turning now to the present issue, the declining of juvenile court jurisdiction faces the defendant with a much harsher world of potential punishment, a point well illustrated by the present case.  Even though the Court followed the State's recommendation and sentenced each defendant to zero months' confinement for each count, the court was required to sentence Houston-Sconiers to 31 years of imprisonment and Roberts to 28 years due to the mandatory firearm enhancements.  Our Supreme Court's recent holding in *State v. O'Dell*, 183 Wn.2d 680, 358 P.3d 359 (2015), that sentencing courts must consider the youthfulness of adult offenders in deciding whether to grant an exceptional downward sentence, does nothing to blunt the force of the mandatory firearm enhancements.  In fact, the zero month base sentences imposed here appear to be a largely ineffective attempt to exercise some discretion in considering the defendants' youth.

The three basic differences between adult and juvenile offenders recognized by *Roper*, *Graham*, and *Miller* are not confined to crimes that may merit the death penalty or life imprisonment without parole.  The impetuousness and lack of maturity, the vulnerability to outside pressure, and the increased capacity for change and redemption each have little to do with the nature of the crime and everything to do with the neurological and psychological development of the individual.  The three decisions recognized that these differences diminished the penological justifications for imposing the harshest sentences on juveniles.  By their nature, these differences would also diminish the penological justifications for automatically subjecting juveniles to many punishments fashioned for adults.  As recognized by *State v. L.W.*,

57

> [w]hile the goals of the adult Sentencing Reform Act (SRA) are overwhelmingly punitive, the goals of the [Juvenile Justice Act] are "more complex," reflecting an intent to protect community safety while also responding to the needs of juvenile offenders. The statute "attempts to tread an equatorial line somewhere midway between the poles of rehabilitation and retribution."

101 Wn. App. 595, 601-02, 6 P.3d 596 (2000) (footnote omitted) (quoting *State v. Rice*, 98 Wn.2d 384, 392, 655 P.2d 1145 (1982)). These differences between adults and juveniles observed by the United States Supreme Court, and the recognized neurological substrate of those differences, call directly into question our law mandating that 16 and 17 year olds committing certain crimes be punished as if they were adults.

*Roper*, *Graham*, and *Miller* also rested their holdings on the fact that the most severe penalties, death and life without parole, were at stake. Using their analysis to question mandatory declination would thus stretch the rationale of those decisions well beyond the use to which they put it. Such, though, was the step taken by *Graham* and *Miller* in using *Roper*'s rationale for the death penalty to justify constitutional restrictions on life sentences without possibility of parole. *Graham* and *Miller* took that step by characterizing "'juvenile life sentences as analogous to capital punishment.'" *Miller*, 132 S. Ct. at 2467 (quoting *Graham*, 560 U.S. at 89-90). Life without parole, the Court stated, shares "some characteristics with death sentences that are shared by no other sentences." *Graham*, 560 U.S. at 69; *Miller*, 132 S. Ct. at 2466. Imprisoning an offender until he dies, *Miller* stated, alters the remainder of his life "'by a forfeiture that is irrevocable.'" *Miller*, 132 S. Ct. at 2466 (quoting *Graham*, 560 U.S. at 69).

Sentencing a 17 year old to 31 years' imprisonment, even with the speculative possibility of sentence reduction, works a similar forfeiture. Walking out of prison as a 48 year old, Houston-Sconiers will have lost his richest years for experience and for growth, the years with the time and the reasons to find one's footing, the years with the most scope to shape one's

future.  The loss of those years is as irrevocable and as potentially deadening as is the loss of the remaining years in a life sentence.  The forfeiture is of similar quality as that at stake in *Miller*.

Some crimes by juveniles may warrant such a forfeiture.  The lesson of *Miller*, though, is that the Eighth Amendment does not allow the possibility of forfeitures of such magnitude to be raised automatically for crimes committed by children, as though by the touch of gear on gear.  Instead, the forfeiture must be allowed through the exercise of human discretion, taking into account all that law and science tells us about the nature of juveniles and the possibility for amendment of life.  Our mandatory declination statute denied Houston-Sconiers and Roberts that chance.  Under the logic of *Roper*, *Graham*, and *Miller*, that denial violated the Eighth Amendment.

These United States Supreme Court decisions also eviscerate *Boot*'s foundations.  *Roper* held that *Stanford*, one of the principal decisions *Boot* relied on, to be "no longer controlling on this issue."  *Roper*, 543 U.S. at 574.  *Graham* and *Miller* repudiated *Boot*'s view that there is no analogy between juvenile life sentences and capital punishment.  *Miller*, 132 S. Ct. at 2467.  The *Boot* court did not have the benefit of the present state of neurological research and, understandably, did not recognize the differences between adult and juvenile offenders shown by that research.  *Boot* also did not have the benefit of *Miller*'s focus on whether a mandatory punishment alters the remainder of a juvenile's life "'by a forfeiture that is irrevocable.'"  *Miller*, 132 S. Ct. at 2466 (quoting *Graham*, 560 U.S. at 70).

For these reasons *Boot* should be deemed no longer controlling.  The arc of reasoning

59

drawn from *Roper* through *Graham* and to *Miller* does not end with the holding of the latter.

That arc leads also to the demise of mandatory declination under the Eighth Amendment.

_____
BJORGEN, J.